# In the United States Court of Federal Claims

No. 16-947C
NOT FOR PUBLICATION
Filed: September 28, 2017

| | |
|---|---|
| 27-35 JACKSON AVE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Contract Disputes Act; 41 U.S.C. §§ 7101, *et seq.*; RCFC 12(b)(1); Subject-Matter Jurisdiction; RCFC 12(b)(6); Failure to State A Claim; Breach Of Contract; Equitable Estoppel; Promissory Estoppel.

*Jeffrey W. Varcadipane, Esq.*, Counsel of Record, Varcadipane & Pinnisi, PC, New York, NY, for plaintiff.

*Daniel S. Herzfeld*, Trial Attorney, *Elizabeth M. Hosford*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Chad A. Readler*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, *Leigh Erin Izzo*, Assistant Regional Counsel, United States General Services Administration, New York, NY, for defendant.

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I.    INTRODUCTION

Plaintiff, 27-35 Jackson Ave. LLC ("27-35 Jackson"), brings this breach of contract action seeking to recover, among other things, $10.6 million in damages from the United States as compensation for an alleged breach of a lease agreement by and between plaintiff and the government, pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012), and the Contract Disputes Act, 41 U.S.C. §§ 7101, *et seq.* (2012). *See generally* Am. Compl. The government has moved to dismiss Counts I and II of the amended complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Rules 12(b)(1) and (b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Def. Mot. For the reasons discussed below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART**

1

the government's motion to dismiss.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Factual Background

In this breach of contract action, 27-35 Jackson seeks to recover, among other things, $10.6 million in damages from the United States as compensation for an alleged breach of a lease agreement by and between plaintiff and the government to provide office space for the United States Department of Homeland Security ("DHS").  *See generally* Am. Compl.  In the amended complaint, 27-35 Jackson alleges that the government has breached the subject lease agreement by failing to fully reimburse plaintiff for the cost of a tenant improvement to the space.  *Id*.  As relief, 27-35 Jackson seeks to recover these costs, as well as reasonable attorneys' fees, experts' fees, and other costs.  *Id*. at Prayer for Relief.

### 1.  The Lease And The Tenant Improvement

The material facts relevant to the government's motion to dismiss are undisputed.  On May 20, 2009, 27-35 Jackson and the General Services Administration (the "GSA") entered into Lease No. GS-02B-23653 (the "Lease") to permit the government to lease certain premises located at 27-35 Jackson Avenue, Long Island City, New York 11101-2917 (the "Premises"). Am. Compl. ¶ 4; *see also* Def. Mot. at Appx1.  The Lease provided the government with the right to use and occupy two floors of the Premises, which would be used as DHS office space for a term of fifteen years.  Am. Compl. ¶¶ 5, 7; *see generally* Def. Notice.

Pursuant to the terms of the Lease, 27-35 Jackson agreed to make a tenant improvement to build out the Premises for use by DHS (the "Tenant Improvement").  Am. Compl. ¶¶ 7-9.  To facilitate the Tenant Improvement, the parties executed a rider to the Lease (the "Rider").  Am. Compl. ¶ 8; *see also* Def. Notice at 5-8.  Thereafter, 27-35 Jackson submitted a proposal to the government for completing the Tenant Improvement.  Am. Compl. ¶¶ 9, 13.  The government issued a notice to proceed with the construction needed to make the Tenant Improvement on June 17, 2010.  *Id*. ¶ 15.

---

[1] The facts in this Memorandum Opinion and Order are taken from plaintiff's amended complaint ("Am. Compl."); the government's motion to dismiss, dated April 18, 2017, ("Def. Mot."); GSA Lease No. GS-02B-23653(the "Lease"); the Rider to the Lease (the "Rider"); and Supplemental Lease Agreement No. 1 (the "Supplemental Lease Agreement").  Unless otherwise noted, the facts recited herein are undisputed.

On October 11, 2011, the government deemed the construction of the Premises to be substantially complete and the government took possession of the Premises on that date. *Id.* ¶¶ 20-21; *see also* Def. Notice at 195-97. During the period October 11, 2011 through January 2015, the government remained at the Premises and paid the amount to be reimbursed for the Tenant Improvement and other rental consideration upon a monthly basis. Am. Compl. ¶ 21.

### 2. Termination Of The Lease

On January 8, 2015, a sprinkler leaked and damaged the Premises. *Id.* ¶ 22. On January 9, 2015, the government informed 27-35 Jackson by letter that it was reserving the right to terminate the Lease, pursuant to Paragraph 17 of the Lease's general clauses. *Id.* ¶ 26. The letter provides, in relevant part:

> As you are aware, on January 8, 2015, the entire Premises was flooded. All personal property of the Government within the Premises was damaged or rendered inoperable. Pursuant to Paragraph 17 of the General Clauses of the Lease, the Government has the unilateral right to terminate the Lease if the Premises has been rendered untenantable by fire or other casualty damage. If we do not terminate, the Government has the option to reduce rent proportionately by amending the lease via lease amendment with respect to the area rendered untenantable by any casualty damage. The Government has determined that the entirety of the leased premises is no longer tenantable.

> Please be advised that the Government may elect to terminate this Lease if the Lessor is unable to remediate the space and restore all the tenant improvement to the as built conditions corresponding to the Lease commencement date (the "As-Built Conditions"). Given that the space is no longer tenantable the Government will be suspending the entirety of the rental payments effective, January 8, 2015 and continuing until such date the Lessor has restored all tenant improvements to the as-built conditions at the time of lease commencement date (the "As-Built Conditions"). The Government shall, in good faith, cooperate with the Lessor in restoring the Premises to the As-Built Conditions as soon as practicable.

> Please provide, by the close of business Monday, January 12, 2015, a remediation plan which outlines the restoration plan to return the space back to tenantable condition. In addition to the remediation plan please provide us with a schedule which shows the timeline in which the Governments [sic] space will be restored and when we can expect [to] regain occupancy at this location. Please provide this schedule by Monday, January 12, 2015 as well.

> After receiving your plans for remediation and restoration, the Government will review your plan and schedule as the basis for determining if it's in the best interest of the Government to terminate the Lease. Please keep in mind that if we do not

receive a response to this notification, then our only choice at that time will be to terminate.

Def. Mot. at Appx12-13; *see also* Am. Compl. ¶ 26.

27-35 Jackson responded to the government's letter by providing a proposed remediation plan. Am. Compl. ¶ 30. The GSA determined, however, that the remediation plan was insufficient and requested that 27-35 Jackson submit a revised remediation plan by January 15, 2015. *Id*. ¶¶ 32-33. 27-35 Jackson subsequently provided the government with a written inspection report prepared by its professional environmental testing firm. *Id*. ¶¶ 34-35.

On January 20, 2015, the government terminated the Lease upon the ground that the Premises were untenantable. *Id*. ¶¶ 36-37; *see also* Def. Mot. at Appx14-15.

### 3. The Lease Agreement, Rider, And Supplemental Lease

The parties executed the Lease, the Rider, and Supplemental Lease Agreement No. 1 (collectively, the "Lease Agreement") to address the terms of the government's lease of the Premises. *See generally* Def. Notice. Several provisions contained in these documents are pertinent to the government's motion to dismiss.

First, with respect to the Tenant Improvement, Paragraph 10 of the Rider provides that:

The Lessor shall contribute a Tenant Improvement (hereinafter "TI") Allowance of $2,407,941.34 towards the cost of TI. Such contribution has been included as part of the rental consideration set forth in Paragraph No. 11 below. The Lessor's contribution toward the TI cost shall be amortized over the 10-year firm term of the lease at an interest rate of 7% per annum ($6.94 per rentable square foot per annum). If the TI cost exceeds the Tenant Improvement Allowance of $55.97 per useable square foot (USF), then the Government shall have the option to either (i) pay the Lessor the difference between $55.97 per USF and the total TI cost in a onetime lump sum payment upon Substantial Completion of the TI, acceptance thereof by the Government and submission of a proper invoice by the Lessor, or (ii) have the right to amortize the difference into the rent in the same manner as set forth above.

*Id*. at 5.

Second, the parties also executed Supplemental Lease Agreement No. 1 on November 10, 2011. *See id*. at 194; Am. Compl. ¶ 18. Paragraph 3 of that agreement addresses the portion of the cost of the Tenant Improvement that was to be amortized into the rent and provides, in relevant part, that:

> The Lessor and the Government previously agreed that the total cost of the tenant improvements is $3,989,402.45, as referenced in Exhibit C attached hereto. Of this amount, $2,407,941.34 has been amortized into the rental rate over the firm term of the lease, as set forth in Paragraph 10 of the Lease. The remaining balance of $1,581,461.12 shall be paid to the Lessor in one (1) lump-sum payment upon receipt of a proper invoice(s) (as described in GSA Form 3517, General Clauses, 552.232-75, *Prompt Payment)* from the Lessor.

Def. Notice at 195 (emphasis existing); *see also* Am. Compl. ¶18.

In addition, Paragraph 11 of the Rider addresses the "annual rental" for the Premises and provides that:

> The Government shall pay the Lessor annual rental as follows:
>
> For years 1 through 5 of the lease term, a total annual rental of $25.04 per rentable square foot for a total of $1,210,133.12 per annum at the rate of $100,844.42 per month in arrears; which annual rental includes the base rate for Operating Costs specified in paragraph 13 of this Rider, plus accrued annual adjustments and $6.94 per rentable sq. ft. ($335,498.89 per annum) for the amortization of the Lessor's contribution to the TI cost as set forth in paragraph 10 above. This annual rental shall be subject to adjustment as set forth in paragraph 10 of this Rider above and paragraphs 2.4, 2.5 and 2.11 herein. Rent for a lesser period shall be prorated.
>
> For years 6 through 10 of the lease term, a total annual rental of $34.98 per rentable square foot for a total of $1,690,513.44 per annum at the rate of $140,876.12 per month in arrears; which annual rental includes the base rate for Operating Costs specified in paragraph 13 of this Rider, plus accrued annual adjustments and $6.94 per rentable sq. ft. ($335,498.89 per annum) for the amortization of the Lessor's contribution to the TI cost. This annual rental shall be subject to adjustment as set forth in paragraph 10 of this Rider above and paragraphs 2.4, 2.5 and 2.11 herein. Rent for a lesser period shall be prorated.
>
> For years 11 through 15 of the lease term, a total annual rental of $31.04 per rentable square foot for a total of $1,500,101.12 per annum at the rate of $125,008.42 per month in arrears; which annual rental includes the base rate for Operating Costs specified in paragraph 13 of this Rider, plus accrued annual adjustments. This annual rental shall be subject to adjustment as set forth in paragraphs 2.4, 2.5 and 2.11 herein  Rent for a lesser period shall be prorated.

Def. Notice at 5-6.

Paragraph 1.5 of the Lease addresses the Tenant Improvements Rental Adjustment and provides, in pertinent part, that:

> All Tenant Improvements shall be identified after award of the contract in accordance with the provisions established in the "Design Intent Drawings"

subparagraph in the "Construction Schedule and Acceptance of Tenant Improvements" paragraph in the MISCELLANEOUS section of this SFO.

1. The Government, at its sole discretion, shall make all decisions as to the usage of the Tenant Improvements Allowance.  The Government may use all or part of the Tenant Improvements Allowance.  The Government may return to the Lessor any unused portion of the Tenant Improvements Allowance in exchange for a decrease in rent according to the amortization rate over the firm term.

2. The Government reserves the right to make cash payments for any or all work performed by the Lessor.  Prior to occupancy, the Government, at its sole discretion, may choose to pay lump sum for any or all of the Tenant Improvements Allowance.  If, prior to occupancy, the Government elects to make a lump sum payment for any portion of the Tenant Improvements Allowance, the payment of the Tenant Improvements Allowance by the Government will result in a decrease in the rent.

3. If it is anticipated that the Government will spend more than the allowance identified above, the Government reserves the right to 1) reduce the Tenant Improvements requirements, 2) pay lump sum for the overage upon completion and acceptance of the improvements, or 3) increase the rent according to the negotiated amortization rate over the firm term of the lease.

4. Payment will not be made by the Government in instances where the Government accepts fixtures and/or other Tenant Improvements already in place. However, the Lessor will be reimbursed for costs to repair or improve the fixture(s) and/or any other improvements already in place.

*Id*. at 13.

Paragraph 9 of the Supplemental Lease Agreement also provides that "[r]ent shall be payable in accordance with Paragraphs 11 and 24 of the Lease." *Id*. at 197; *see also* Def. Mot. at Appx.11.

Lastly, the Lease and the Rider also contain provisions that address fire and casualty damage to the Premises and the termination of the Lease.  Def. Notice at 5, 52.  Specifically, Paragraph 17 of the Lease incorporates the Fire and Casualty Damage clause found in GSA Regulation 552.270-7 and provides that:

If the entire premises are destroyed by fire or other casualty, this lease will immediately terminate.  In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within 15 calendar days of the fire or other casualty; if so terminated, no rent will accrue to the Lessor after such partial destruction or damage; and

6

> if not so terminated the rent will be reduced proportionately by
> supplemental agreement hereto effective from the date of such partial
> destruction or damage.  Nothing in this lease shall be construed as
> relieving Lessor from liability for damage to or destruction of property of
> the United States of America caused by the willful or negligent act or
> omission of Lessor.

*Id*. at 52; *see also* Am. Compl. ¶ 37; 48 C.F.R. § 552.270-7 (2011).  In addition, Paragraph 9 of

the Rider provides:

> TERMINATION RIGHT: THE GOVERNMENT MAY TERMINATE this Lease
> in whole or in part at any time on or after the last day of the tenth (10th) year by
> giving at least one hundred twenty (120) days' prior notice in writing to the
> Lessor and no rental shall accrue after the effective date of termination.

Def. Notice at 5; *see also* Def. Mot. at Appx3.

**B.  Procedural History**

Plaintiff commenced this action on August 5, 2016.  *See generally* Compl.  On November

15, 2016, the government filed a motion to dismiss the complaint, pursuant to RCFC 12(b)(1)

and (b)(6).

On December 16, 2016, 27-35 Jackson filed a motion to amend the complaint, pursuant

to RCFC 15, which the Court granted on December 20, 2016.  *See generally* Pl. Mot. and Order

dated, Dec. 20, 2016.  On December 20, 2016, 27-35 Jackson filed an amended complaint.  *See*

*generally* Am. Compl.  On April 18, 2017, the government filed a motion to dismiss Counts I

and II of the amended complaint, pursuant to RCFC 12(b)(1) and (b)(6).  *See generally* Def. Mot.

On June 19, 2017, 27-35 Jackson filed a response and opposition to the government's

motion to dismiss.  *See generally* Pl. Resp.  On July 13, 2017, the government filed a reply in

support of its motion to dismiss.  *See generally* Def. Reply.  On August 24, 2017, the

government filed complete copies of the Lease, the Rider, and Supplemental Lease Agreement

No. 1, pursuant to the Court's Order, dated August 16, 2017.  *See generally* Def. Notice; and

Order, dated Aug. 16, 2017.

The government's motion to dismiss having been fully briefed, the Court resolves the

pending motion.

III.   **LEGAL STANDARDS**

A.  **Jurisdiction, RCFC 12(b)(1), And Contract Claims**

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* RCFC 12(b)(1). But, plaintiff bears the burden of establishing subject-matter jurisdiction, and plaintiff must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). And so, should the Court determine that "it lacks jurisdiction over the subject-matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) (citations omitted); *see also* RCFC 12(h)(3).

In this regard, the United States Court of Federal Claims is a Court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The Tucker Act is, however, a jurisdictional statute. It does not create any substantive right enforceable against the United States for money damages. Rather, the Tucker Act merely confers jurisdiction upon the Court whenever that substantive right exists. *United States v. Testan*, 424 U.S. 392, 398 (1976). And so, to pursue a substantive right against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States. *Cabral v. United States*, 317 F. App'x. 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005)).

With regard to contract claims, the Court possesses jurisdiction to consider claims based "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). But, the

Court does not possess jurisdiction to consider claims against the United States "based on contracts implied in law." *United States v. Mitchell*, 463 U.S. 206, 218 (1983) (citing *Merritt v. United States*, 267 U.S. 338, 341 (1925)); *Aboo v. United States*, 86 Fed. Cl. 618, 626 (2009), *aff'd*, 347 F. App'x. 581 (Fed. Cir. 2009). And so, to bring a valid contract claim against the United States in this Court, the underlying contract must be either express or implied-in-fact. *Aboo*, 86 Fed. Cl. at 626-27.

To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon. *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012). In addition, a government official's actual authority to bind the United States must be express or implied. *Roy v. United States*, 38 Fed. Cl. 184, 188-89 (1997), *dismissed*, 124 F.3d 224 (Fed. Cir. 1997). And so, "the [g]overnment, unlike private parties, cannot be bound by the apparent authority of its agents."[2] *Id*. at 187.

### B.  RCFC 12(b)(6)

When deciding a motion to dismiss based upon failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6), this Court must also assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Redondo v. United States*, 542 F. App'x 908, 910 (Fed. Cir. 2013). And so, to survive a motion to dismiss under RCFC 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[2] A government official possesses express actual authority to bind the United States in contract "only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." *Jumah v. United States*, 90 Fed. Cl. 603, 612 (2009), *aff'd*, 385 F. App'x. 987 (Fed. Cir. 2010) (internal citations omitted); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). On the other hand, a government official possesses implied actual authority to bind the United States in contract "when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees." *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2006) (citations omitted). In addition, when a government agent does not possess express or implied actual authority to bind the United States in contract, the government can still be bound by contract if the contract was ratified by an official with the necessary authority. *Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998).

When the complaint fails to "state a claim to relief that is plausible on its face," the Court must dismiss the complaint. *Iqbal*, 556 U.S. at 678 (citation omitted). On the other hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity," and determine whether it is plausible, based upon these facts, to find against the defendant. *Id.* at 663-64, 679 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### C.  Contract Interpretation

The United States Court of Appeals for the Federal Circuit has held that "[c]ontract interpretation is a question of law." *Barron Bancshares, Inc., v. United States*, 366 F.3d 1360, 1368 (Fed. Cir. 2004). It is also well-established that the Court's interpretation of a contract begins with the contract's "plain language." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). And so, the plain and unambiguous provisions of a contract "'must be given their plain and ordinary meaning' . . . and the court may not resort to extrinsic evidence to interpret them." *Id.* (first quoting *Alaska Lumber and Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993); and then citing *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994)); *see also Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (The Court gives "the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning."); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) (citations omitted) ("Wherever possible, words of a contract should be given their ordinary and common meaning.").

The Federal Circuit has held that a Court should also interpret the "provisions of a contract so as to make them consistent" and so as not "to render them ineffective or superfluous.'" *Abraham v. Rockwell Int'l. Corp.*, 326 F.3d 1242, 1251, 1254 (Fed. Cir. 2003); *Fortec Constructors v. United States*, 760 F.2d 1288 (Fed. Cir. 1985) ("This court must be guided by the well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."). But, in instances in which "there is a clear conflict between" contract clauses, the Court must "determine which of the conflicting terms controls." *Abraham*, 326 F.3d at 1253-54 (emphasis existing) (citing *Hills Materials Co.*, 982 F.2d at 517). To do so, the Court must apply the "general rules of interpretation," which require that, "'[w]here specific and general

10

terms in a contract are in conflict, *those which relate to a particular matter control over the more general language.*'" *Id.* at 1254 (citations omitted) (emphasis existing).

The Federal Circuit has also recognized that a contract that is reasonably susceptible to more than one interpretation is ambiguous. *Hills Materials Co.*, 982 F.2d at 516 (citations omitted). Where a latent ambiguity exists in a contract, "the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable," under the general rule of *contra proferentem.* *Id.* (citations omitted); *see also NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("To show an ambiguity it is not enough that the parties differ in their respective interpretations . . . both interpretations must fall within the zone of reasonableness."); *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("Before a court may enforce the general rule of *contra proferentem* against the drafter of an ambiguity, the contractor's interpretation of that ambiguity must be reasonable."). But, "an exception to the general rule that requires construing ambiguities against" the drafter exists where "the ambiguities are 'so "patent and glaring" that it is unreasonable for a [party] not to discover and inquire about them.'" *HPI/GSA-3C, LLC* , 364 F.3d at 1334 (citations omitted). "Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentem* applies." *Id.* (citations omitted).

### D.  The Contract Disputes Act

Pursuant to the Tucker Act, this Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act or the "CDA"]." 28 U.S.C. § 1491(a)(2). A plaintiff must meet two jurisdictional prerequisites to bring a claim under the CDA:  (1) submit a proper claim to the relevant contracting officer, which must be properly certified if the amount requested is above $100,000, and (2) obtain a final decision on that claim. 41 U.S.C. § 7103(a); *see also Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575-76 (Fed. Cir. 1995).

A contractor may obtain either an actual or a deemed final decision on a CDA claim. *Claude E. Atkins Enters., Inc. v. United States,* 27 Fed. Cl. 142, 143 (1992). For claims over $100,000, the CDA provides that the contracting officer shall, within 60 days of receipt of the submitted certified claim: "(A) issue a decision; or (B) notify the contractor of the time within which a decision will be issued." 41 U.S.C. § 7103(f)(2). The CDA also requires that a

11

contracting officer's decision be "issued within a reasonable time," which is calculated by "taking into account such factors as the size and complexity of the claim and the adequacy of information in support of the claim provided by the contractor." 41 U.S.C. § 7103(f)(3). If the contracting officer denies the claim within the required time period, that claim is actually denied. *Id*. However, a failure to issue a decision within the required time "is deemed to be a decision by the contracting officer denying the claim." 41 U.S.C. § 7103(f)(5). A denial, actual or deemed, authorizes an appeal or action on the claim. *Id*.

### E. Promissory Estoppel And Equitable Estoppel

This Court has held that "[e]quitable estoppel 'is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled.'" *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 783 (2015) (quoting *Am. Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 679 (2007)); *see also Carter v. United States*, 98 Fed. Cl. 632, 638 (2011). By contrast, promissory estoppel "is 'essentially an equitable cause of action whereby one who reasonably relies on another's promise can subsequently require [him] to make good on his promise.'" *XP Vehicles, Inc.*, 121 Fed.Cl. at 782 (brackets existing) (quoting *Carter,* 98 Fed. Cl. at 638). Given this, "'promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute.'" *Carter*, 98 Fed. Cl. at 639 (quoting *Knaub v. United States*, 22 Cl. Ct. 268, 276 (1991)); s*ee also XP Vehicles, Inc.*, 121 Fed. Cl. at 783 (brackets existing) (citing *Carter*, 98 Fed. Cl. at 638) ("By contrast . . . promissory estoppel is an 'equitable cause of action' where one who 'reasonably relies on another's promise can subsequently require [him] to make good on [that] promise.'"). And so, "'promissory estoppel is a sword, and equitable estoppel is a shield.'" *Carter*, 98 Fed. Cl. at 639 (quoting *Knaub*, 22 Cl. Ct. at 276).

This Court has held that "[p]romissory estoppel . . . requires [that] the court find an implied-in-law contract, a claim for which the United States has not waived its sovereign immunity." *Steinberg v. United States*, 90 Fed. Cl. 435, 443 (2009) (citations omitted). And so, the Court does not possess subject-matter jurisdiction to consider promissory estoppel claims against the United States. *Id*.; *see also Russell Corp. v. United States,* 210 Ct. Cl. 596, 609 (1976) ("This court, of course has no jurisdiction to render judgment against the United States

based upon a contract implied in law."); *De Archibold v. United States,* 57 Fed. Cl. 29, 32 (2003) (citing *Russell Corp.,* 537 F.2d at 482) ("It is well-established that a duty imposed by law does not create a contract within the Tucker Act jurisdiction of this court.").

## IV.   LEGAL ANALYSIS

The government has moved to dismiss Count I of the amended complaint, pursuant to RCFC 12(b)(6), upon the ground that the amended complaint fails to plausibly plead that the rent due under the Lease Agreement excludes the Tenant Improvement costs—and, as a result, that plaintiff may not separately recover these costs. Def. Mot. at 8-10. The government also seeks dismissal of Count II of the amended complaint upon the grounds that: (1) the amended complaint fails to plausibly plead a claim that the government's January 9, 2015, notice of untenantability creates a new contract; or (2) alternatively, the Court does not possess subject-matter jurisdiction to consider Count II, because plaintiff alleges an implied-in-fact contract, pursuant to RCFC 12(b)(1) and (b)(6). *Id.* at 10-15.

27-35 Jackson counters that the amended complaint asserts a viable breach of contract claim to recover the Tenant Improvement costs, because these costs are not included in the rent under the terms of the Lease Agreement. Pl. Resp. at 6-9. 27-35 Jackson also argues that the Court may consider Count II of the amended complaint, because plaintiff asserts a claim for equitable estoppel. *Id.* at 9-11.

For the reasons discussed below, a careful reading of the amended complaint shows that 27-35 Jackson fails to state a plausible claim to recover the Tenant Improvement costs and that plaintiff similarly fails to state a plausible breach of contract claim based upon the government's January 9, 2015, notice of untenantability. A close review of the amended complaint also shows that the Court does not possess subject-matter jurisdiction to consider 27-35 Jackson's claim that government should be estopped from "asserting 'untenantability' as a basis for terminat[ing]" the Lease Agreement, because plaintiff detrimentally relied upon the government's alleged promises in that notice. Am. Compl. ¶ 57.

The Court may, however, consider plaintiff's claim that the government should "be estopped from justifying its attempted termination [of the Lease Agreement] via paragraph 17 [of the Lease]" due to the government's own alleged actions and/or omissions. *Id.* ¶ 58. And so, the Court **GRANTS** the government's motion to dismiss Count I of the amended complaint and

**GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss Count II of the amended complaint.

### A. 27-35 Jackson Fails To State A Plausible Breach Of Contract Claim To Recover The Tenant Improvement Costs

As an initial matter, a plain reading of the complaint and the Lease Agreement shows that 27-35 Jackson fails to state a plausible breach of contract claim regarding the unreimbursed Tenant Improvement costs. The Lease Agreement makes clear that the government is relieved of the obligation to pay these costs if the Lease has been properly terminated due to partial destruction or damage. *See* Def. Notice at 52.

In Count I of the amended complaint, 27-35 Jackson alleges that the government remains obligated to pay the unreimbursed Tenant Improvement costs following the termination of the Lease Agreement, because these costs are a separate and distinct payment obligations from the government's obligation to pay rent. Am. Compl. ¶¶ 40, 45. And so, 27-35 Jackson maintains that the government has breached the Lease Agreement by failing to continue to pay these costs following the termination of the Lease Agreement. *Id*. ¶¶ 38-46; Pl. Resp. at 6-9.

In its motion to dismiss, the government counters that terms of the Lease Agreement make clear that the Tenant Improvement costs are included in the rent and that, in particular, Paragraph 17 of the Lease expressly relieves the government of the obligation to pay rent if the agreement is terminated due to fire or casualty. Def. Mot. at 8-10. And so, the government maintains that, once the GSA terminated the Lease pursuant to Paragraph 17, the government had no obligation to continue to pay the Tenant Improvement costs. *Id*. For the reasons discussed below, the Court agrees.

First, 27-35 Jackson's claim that the Tenant Improvement costs constitute a separate and distinct payment obligation under the terms of the Lease Agreement is contradicted by the plain terms of the agreement. It is well-established that the Court's interpretation of a contract begins with the contract's "plain language." *McAbee Constr., Inc.*, 97 F.3d at 1435. And so, where, as is the case here, the Lease Agreement is unambiguous, the plain and unambiguous provisions of the agreement "'must be given their plain and ordinary meaning' . . . and the court may not resort to extrinsic evidence to interpret them." *Id.* (first quoting *Alaska Lumber*, 2 F.3d at 392; and

then citing *Interwest Constr.*, 29 F.3d at 615); *see also Jowett, Inc.*, 234 F.3d at 1368; *Hills Materials Co.*, 982 F.2d at 516.

In this case, the parties agree that Paragraph 17 of the Lease's general clauses relieves the government of the obligation to pay "rent" if the government terminates the Lease Agreement in the event of partial destruction, or damage, of the Premises. *See* Pl. Resp. at 7-8; Def. Mot. at 10. In this regard, the Lease Agreement provides, in pertinent part, that:

> In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within 15 calendar days of the fire or other casualty; *if so terminated, no rent will accrue to the Lessor after such partial destruction or damage. . . .*

Def. Notice at 52 (emphasis supplied); *see also* Am. Compl. ¶ 37. And so, the central issue to be resolved by the Court in considering the government's motion to dismiss Count I is whether the Tenant Improvement costs are included in the rent.

A plain reading of the Lease Agreement makes clear the Tenant Improvement costs are included in the rent. The Court observes that the term "rent" is not defined in the Lease Agreement. *See generally* Def. Notice. But, a reading of the Lease Agreement, nonetheless, makes clear that the parties intended for the Tenant Improvement costs to be included in the rent.

Specifically, Paragraph 10 of the Rider to the Lease provides, in relevant part, that: "[t]he Lessor shall contribute a Tenant Improvement (hereinafter "TI") Allowance of $2,407,941.34 towards the cost of TI. *Such contribution has been included as part of the rental consideration set forth in Paragraph No. 11 below." Id*. at 5 (emphasis supplied). Paragraph 11 of the Rider to the Lease further clarifies that the government will reimburse the Tenant Improvement costs as part of the "annual rental" and provides, in relevant part, that:

> The Government shall pay the Lessor *annual rental* as follows:
>
> For years 1 through 5 of the lease term, a total annual rental of $25.04 per rentable square foot for a total of $1,210,133.12 per annum at the rate of $100,844.42 per month in arrears; *which annual rental includes* the base rate for Operating Costs specified in paragraph 13 of this Rider, plus accrued annual adjustments and $6.94 per rentable sq. ft. ($335,498.89 per annum) for *the amortization of the Lessor's contribution to the TI cost as set forth in paragraph 10 above. . . .* Rent for a lesser period shall be prorated . . .

*Id*. at 5-6 (emphasis supplied).  And so, the Lease Agreement provides that the "annual rental" includes the Tenant Improvement costs that the government is to reimburse under the terms of the Lease Agreement.

The Lease Agreement also makes clear that the words "rent" and "rental" are used interchangeably throughout the agreement and that both words encompass the Tenant Improvement costs.  In its opposition to the government's motion to dismiss, 27-35 Jackson correctly argues that the Lease Agreement uses the word "rental," rather than "rent," when addressing the Tenant Improvement costs in several places in the agreement.  Pl. Resp. at 7-8. But, a careful reading of the Lease Agreement shows that these two words are, nonetheless, used interchangeably throughout that agreement.

For example, after describing how the Tenant Improvement costs will be included in the "annual rental," Paragraph 11 of the Rider also provides that the "*[r]ent for a lesser period shall be prorated.*"  Def. Notice at 6 (emphasis supplied).  Paragraph 9 of the Supplemental Lease Agreement similarly provides that "*[r]ent shall be payable in accordance with Paragraphs 11 and 24 of the [Rider to the] Lease.*"[3]  *Id*. at 197 (emphasis supplied).

Paragraph 1.5 of the Lease's general clauses also repeatedly uses the word "rent" to discuss the Tenant Improvement rental adjustment.  Notably, this provision provides, in relevant part that:

> The Government may return to the Lessor any unused portion of the Tenant Improvements Allowance in exchange for a decrease in *rent* according to the amortization rate over the firm term . . . .

> If, prior to occupancy, the Government elects to make a lump sum payment for any portion of the Tenant Improvements Allowance, the payment of the Tenant Improvements Allowance by the Government will result in a decrease in the *rent* . . . .

---

[3] The Supplemental Lease Agreement also provides in Paragraph 3 that ". . . the total cost of the tenant improvements is $3,989,402.45 [and that] . . . [o]f this amount, $2,407, 941.34 has been amortized into the *rental* rate. . . ."  Def. Notice at 195 (emphasis supplied).  Paragraph 24 of the Rider, which pertains to the payment of a cooperating lease commission, also refers to a monthly "*rental*" payment, as well as monthly "*rent*."  *Id*. at 7 (emphasis supplied).

> If it is anticipated that the Government will spend more than the allowance identified above, the Government reserves the right to . . . increase the *rent* according to the negotiated amortization rate over the firm term of the lease . . . .

*Id*. at 13 (emphasis supplied).  And so, the text of the Lease Agreement demonstrates that this agreement uses the words "rent" and "rental" interchangeably and that the parties intended for the Tenant Improvement costs to be included in the rent.

The Court's reading of the Lease Agreement to employ the words "rent" and "rental" interchangeably is also supported by the definition of the word "rental" in Black's Law Dictionary.  Black's Law Dictionary defines the word "rental" to mean—"[t]he amount received as rent."  *Rental*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Given this, the Court assigns the word "rental," as it is used in the Lease Agreement, its plain and ordinary meaning, and the Court reads the Lease Agreement to include the Tenant Improvement costs in the rent.

The Court is also unpersuaded by 27-35 Jackson's argument that the Court should not dismiss Count I of the amended complaint, because the Tenant Improvement costs at issue accrued when the government signed the Lease Agreement.  Pl. Resp. at 8-9.  Plaintiff' argument is belied by the plain text of the Lease Agreement.  The Rider to the Lease makes clear that the Tenant Improvement costs are to be amortized over a 10-year period: "The Lessor's contribution toward the TI cost shall be amortized over the 10-year firm term of the lease at an interest rate of 7% per annum ($6.94 per rentable square foot per annum)."  Def. Notice at 5.

The Lease Agreement also makes clear that the government's one-time, lump-sum payment of a portion of the Tenant Improvement costs at the start of the lease term was intended to make up the difference between the anticipated Tenant Improvement costs and the actual costs incurred by 27-35 Jackson.  In this regard, paragraph 10 of the Rider provides that:

> If the TI cost exceeds the Tenant Improvement Allowance of $55.97 per useable square foot (USF), then the Government shall have the option to either (i) pay the Lessor the difference between $55.97 per USF and the total TI cost in a onetime lump sum payment upon Substantial Completion of the TI, acceptance thereof by the Government and submission of a proper invoice by the Lessor, or (ii) have the right to amortize the difference into the rent in the same manner as set forth above.

*Id*. at 5.  And so, the Court does not construe the Lease Agreement to provide that the government's obligation to pay all of the Tenant Improvement costs accrued at the start of the lease term.

The parties' agreement that the government could make a one-time, lump-sum payment to reimburse 27-35 Jackson for a portion of the Tenant Improvement costs also demonstrates that the entirety of these costs were not due at the start of the term of the Lease Agreement. *See id.* at 195. And so, as the government correctly observes in its reply brief, the Lease Agreement's terms demonstrate that the remaining Tenant Improvement costs did not accrue until rental payments became due under the terms of the Lease Agreement. *See* Def. Reply at 7.

Indeed, the only reasonable reading of the Lease Agreement at issue in this case is to read this agreement to provide that the Tenant Improvement costs would be paid by the government as part of the rent over the life of the Lease Agreement and that this payment obligation would cease in the event of the termination of the Lease Agreement by the government due to partial destruction, or damage, that renders the Premises untenantable. 27-35 Jackson has not identified—and the Court does not find—any language in the Lease Agreement to require the government to continue to pay the Tenant Improvement costs if the Lease Agreement has been properly terminated under such circumstances.

Given this, 27-35 Jackson fails to state a plausible breach of contract claim regarding these costs in the amended complaint. And so, the Court must dismiss Count I of the amended complaint. RCFC 12(b)(6).

## B. The Court Must Also Dismiss Portions Of Count II

A careful reading of the amended complaint also shows that the Court must dismiss a portion of Count II of the amended complaint for lack of subject-matter jurisdiction, or for failure to state a claim upon which relief can be granted. RCFC 12(b)(1); RCFC 12(b)(6).

As the plaintiff appears to acknowledge in its opposition to the government's motion to dismiss, 27-35 Jackson fails to state a plausible claim that the government's January 9, 2015, notice creates a new contract with the government in Count II of the amended complaint. Am. Compl. ¶¶ 47-57. And so, the Court must dismiss this claim.

As the government correctly argues in its motion to dismiss, the text of the government's January 9, 2015, notice of untenantability makes clear that this notice does not create a new contractual obligation that is binding upon the government. *See* Def. Mot. at 10-13; Def. Reply at 8-9; Pl. Resp. at 9-11. The notice at issue provides, in relevant part, that:

> All personal property of the Government within the Premises was damaged or rendered inoperable.  Pursuant to Paragraph 17 of the General Clauses of the Lease, the Government has the unilateral right to terminate the Lease if the Premises has been rendered untenantable by fire or other casualty damage. . . . Please be advised that the Government may elect to terminate this Lease if the Lessor is unable to remediate the space and restore all the tenant improvement to the as-built conditions corresponding to the Lease commencement date (the "As-Built Conditions"). . . .

Def. Mot. at Appx12-13; *see also* Am. Compl. ¶¶ 26-28.  And so, this notice makes clear that the purposes of the notice is to inform plaintiff of the government's right to terminate the Lease Agreement if the Premises are rendered untenantable.

27-35 Jackson also points to no language in this notice to demonstrate an unambiguous offer and acceptance of new contractual terms, mutuality of intent, consideration, or that an authorized government representative agreed to the alleged contract.  *See generally* Am. Compl; Pl. Resp.; *see also Kam-Almaz*, 682 F.3d at 1368 (To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.).  Given this, plaintiff has simply not sufficiently alleged the elements required to establish the existence of a contract with the government, and so, the Court must dismiss this claim. RCFC 12(b)(6).[4]

To the extent that plaintiff alleges an implied-in-law contract claim in Count II of the amended complaint, the Court must also dismiss this claim for lack of subject-matter jurisdiction.  In Count II, 27-35 Jackson alleges, among other things, that the government "breached its representations, promises and contract" in the January 9, 2015, notice by, among other things, failing to cooperate in good faith with the effort to restore the Premises to a tenantable condition.  Am. Compl. ¶¶ 48-57.  And so, plaintiff alleges that the delay in the efforts to restore the Premises to a tenantable condition "was a direct result of the [g]overnment's representations and demands, upon which 27-35 Jackson relied to its detriment and prejudice,"

---

[4] Plaintiff alleges in the amended complaint that it also brings this action pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101, *et seq.* (2012) (the "CDA").  Am. Compl. ¶ 1.  But, plaintiff has alleged no facts to establish jurisdiction under the CDA.  *See generally id.*

and that the government should be estopped from "asserting 'untenantability' as a basis for terminat[ing]" the Lease Agreement.  *Id.* ¶ 57.

Although styled as a claim for equitable estoppel, plaintiff's claim is plainly a claim for promissory estoppel.  As the government correctly argues in its motion to dismiss, 27-35 Jackson alleges that plaintiff detrimentally relied upon the government's alleged promises in the January 9, 2015, notice and that these alleged promises should be enforced.  Def. Mot. at 15; *see also* Def. Reply at 9.  This Court has held that such a claim is a claim for promissory estoppel.[5]  *XP Vehicles, Inc.,* 121 Fed. Cl. at 784.  This Court has also long recognized that promissory estoppel is a claim for which the United States has not waived its sovereign immunity."  *Steinberg*, 90 Fed. Cl. at 443.  And so, the Court must dismiss 27-35 Jackson's promissory estoppel claim for lack of subject-matter jurisdiction.  RFCF 12(b)(1); *see also De Archibold,* 57 Fed. Cl. at 32 (citing *Russell Corp.*, 537 F.2d at 482) ("It is well-established that a duty imposed by law does not create a contract within the Tucker Act jurisdiction of this court.").

27-35 Jackson is, however, on much firmer ground in arguing that the Court may consider its claim that the government should be "estopped from justifying [the GSA's] attempted termination [of the Lease Agreement] via paragraph 17" due to the government's own alleged actions or omissions.  Am. Compl. ¶ 58.  This particular allegation constitutes a claim for equitable estoppel—"'a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled.'"  *XP Vehicles, Inc.*, 121 Fed. Cl. at 783 (quoting *Am. Airlines, Inc.*, 77 Fed. Cl. at 679); *see also* Am. Compl. ¶¶58-60; Pl. Resp. at 10-11.  And so, the Court reads this portion of Count II to allege a claim for equitable estoppel, and plaintiff may pursue such a claim in this litigation.  *See Carter*, 98 Fed. Cl. at 639 (quoting *Knaub*, 22 Cl. Ct. at 276); RCFC 12(b)(1).[6]

---

[5] This Court has held that to prevail on a claim of promissory estoppel, a party must prove that: (1) "'there was a promise or representation made;'" (2) "'the promise or representation was relied upon by the party asserting the estoppel in such a manner as to change his position for the worse;'" and (3) "'the promisee's reliance was reasonable and should have been reasonably expected by the promisor.'"  *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 782 (2015) (quoting *Steinberg v. United States*, 90 Fed. Cl. 435, 443 (2009)).  This Court has also held that "'[d]etrimental reliance is [only] an element of a claim of promissory estoppel, a contract implied in law, [and] is not an element of a contract in fact.'"  *Steinberg,* 90 Fed. Cl. at 444.

[6] The Court reads plaintiffs' allegation that the government should be precluded from terminating the Lease Agreement due to the government's alleged "failure to allow re-entry and/or timely respond to [an]

## V.     CONCLUSION

In sum, a careful reading of the amended complaint and the Lease Agreement show that 27-35 Jackson fails to state a plausible breach of contract claim in Count I of the amended complaint, because the government has no obligation to continue to pay the Tenant Improvement costs in the event that the agreement is properly terminated pursuant to Paragraph 17 of the Lease Agreement.  A review of the amended complaint also shows that the Court must dismiss portions of Count II of the amended complaint, because plaintiff fails to allege a plausible breach of contract claim regarding the government's January 9, 2015, notice and because plaintiff also alleges a promissory estoppel claim for which the government's sovereign immunity has not been waived.

And so, for the foregoing reasons, the Court:

1.  **GRANTS** the government's motion to dismiss Count I of the amended complaint; and

2.  **GRANTS-IN-PART** and **DENIES–IN-PART** the government's motion to dismiss Count II of the amended complaint.

The parties shall **FILE** a joint status report stating their respective views regarding how this matter should proceed and, if warranted, proposing a schedule for discovery, on or before **October 27, 2017**.

**IT IS SO ORDERED**.

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge

---

emergency" to pertain to an alleged breach of the Lease Agreement and not to be limited to the government's January 9, 2015, notice.  Am. Compl. ¶¶ 58-60.  And so, the Court declines to dismiss this portion of Count II of the amended complaint upon the ground that ground that plaintiff fails to state a plausible breach of contract claim with regards to that notice.