# In the United States Court of Federal Claims

No. 16-947
Filed: October 12, 2022

**27-35 JACKSON AVE. LLC,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*.

*Jeffrey W. Varcadipane*, Varcadipane & Pinnisi, PC, New York, New York, for Plaintiff.

*Stephanie A. Fleming*, Trial Attorney, *Elizabeth M. Hosford*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., *Leigh E. Izzo*, Senior Assistant Regional Counsel, General Services Administration, of counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

The resolution of every contract claim begins, and often ends, with the agreement itself. Plaintiff, 27-35 Jackson Ave., LLC, ("Jackson"), invites the Court to depart from the discretion it contracted for with the United States in connection with a lease agreement for office space located in New York City. The Court declines to do so.

Here, the parties agreed that the untenantability of the leased premises was to be determined by the United States. After a sprinkler head burst, water damaged the property, and the United States, acting through the General Services Administration ("GSA"), concluded the premises were untenantable and exercised a contractual right to terminate the lease. Jackson challenges this termination. It argues (1) the United States never made a "determination" of untenantability because its decision lacked an objective standard and instead relied on its subjective belief about the adequacy of Jackson's plan to restore the premises; (2) that the decision to terminate the lease was pretextual and therefore violated the implied duty of good faith and fair dealing; and (3) the United States should be equitably estopped from terminating the lease because its own actions contributed to damage to the property.

Because the plain language of the lease provided that untenantability was to be "determined by the Government," the Court finds that the United States did not breach the contract by relying on its own standard to determine untenantability as opposed to a standard supplied by Jackson. Further, even when viewing the evidence in the light most favorable to

Jackson, the Court finds that Jackson has failed to establish a genuine issue of material fact sufficient to preclude summary judgment as to Jackson's claims for violation of the duty of good faith and fair dealing and equitable estoppel. Accordingly, the Court grants the United States' motion for summary judgment, (ECF No 82), and denies Jackson's cross-motion for summary judgment, (ECF No. 88).

## I. Background

GSA leased two floors of space at a building in Long Island City, New York, from Jackson. (Pl.'s Am. Compl. at ¶ ¶ 4-6, ECF No. 13). GSA used these premises to house field offices for the Department of Homeland Security's United States Citizenship and Immigration Services ("USCIS"). (*Id.* ¶ 7). USCIS used the space for its daily operations, including meeting with members of the public seeking visas and other immigration services. (Def.'s Mot. App. 345). [1] To accommodate this use, the United States included requirements of specialized security infrastructure, customized surfaces, and other requirements, together referred to as tenant's improvements ("TI"). (Pl.'s Mot. App. 341, 344, 383).

The lease included a contingency for total or partial destruction of the building. It provided that, "[i]f the entire premises are destroyed by fire or other casualty," the lease "will immediately terminate." (*Id.* at 64 (Lease GS-02B-23653, General Clauses, ¶17)). Partial destruction, however, did not immediately terminate the lease; instead, the lease provided that: "In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within 15 calendar days of the fire or other casualty[.]" (*Id.*).

After executing the lease, the relationship between USCIS and Jackson soured. From the outset, USCIS was dissatisfied with the delays in completing the build-out and its quality, attributing those delays to Jackson. (Pl.'s Mot. App. at 264). In the years leading up to termination of the lease, USCIS was routinely in contact with Jackson about issues that it deemed disruptive to its tenancy, including among others, trucks idling under a nearby bridge, issues related to construction of a hotel next door, disturbances related to construction on the floors above USCIS, and criticisms of the alleged poor quality of the build-out. (Pl.'s Mot. App. at 180, 197–8, 210–11, 389). USCIS also filed complaints with Jackson about leaks, dust, noise, and the possibility of asbestos. (Pl.'s Mot. App. at 574–75). With many of these incidents,

---

[1] Citations to the record in this opinion are from the appendix accompanying Defendant's motion for summary judgment, (ECF No. 82-1), referred to as "Def.'s Mot. App. \_\_" and the appendix accompanying Plaintiff's cross-motion for summary judgment, (ECF No. 88-1), referred to as "Pl.'s Mot. App. \_\_". These citations refer to the appendix paginations within these documents as filed with the Court and may not always correspond with the ECF-assigned page number on which the appendix appears.

USCIS's concerns persisted even after Jackson's efforts to address the complaints.[2] (Def.'s Mot. App. 251–54 (2013 Summary of Issues at 27-35 Jackson)). It is against the backdrop of this cantankerous relationship that the parties frame the incident on January 8, 2015.[3]

In the early hours of that morning, USCIS staff discovered that portions of the leased space were flooded because of a broken sprinkler head. (Def.'s Mot. App. at 98). At 5:30 a.m., Ruben Vargas, a USCIS staff member, discovered the leak and notified the New York City Fire Department (FDNY) and the MegaCenter, the Government's security alarm service provider. (Def.'s Mot. App. 98). After arriving on the scene, FDNY shut off the water to the location at 5:55 a.m. (*Id.*). The United States asserts that the water intrusion affected the public reception areas, presentation rooms, the room housing USCIS servers and security infrastructure, and also damaged confidential files and electronic equipment. (Def.'s Mot. App. at 137–92; Pl.'s Mot. App. 430, 356, 404).

The very next day, January 9, GSA notified Jackson it "determined that the entirety of the leased premises is no longer tenantable." (Pl.'s Mot. App. 69). The letter also informed Jackson of GSA's position that, under the untenantability clause of the lease, "the Government ha[d] the unilateral right to terminate the Lease if the Premises has been rendered untenantable . . . ." (*Id.*). The letter from GSA advised Jackson that the United States "may elect" to exercise that power if Jackson "is unable to remediate the space" and "restore all the tenant improvement to the as built conditions corresponding to the [l]ease commencement date . . . ." (*Id.*).

On January 12, GSA received Jackson's initial plan for remediation, a plan provided by ServPro, the company recruited by Jackson to address the damage. (Def.'s Mot. App. 138–139). The initial plan submitted by Jackson included a timeline for both remediation and restoration of the spaces; however, even though it included a detailed breakdown of individual remediation tasks to be done by ServPro on a daily basis (such as extracting water, drying equipment, removing walls, ceilings, ceiling tiles, carpets, flooring, drywall, and many other building materials), it did not include a similar detailed breakdown for restoration tasks (such as installing

---

[2] When USCIS employees became concerned about asbestos on the premises, Jackson responded by conducting an air quality assessment, but employees continued to voice their discomfort with "poor air quality." (Pl.'s Mot. App. 313–314). When USCIS found an upstairs tenant's ongoing construction to be disturbing, Jackson modified the working hours and implemented a "dust containment protocol," but USCIS remained dissatisfied with the "continued adverse impact" on its operations. (Pl.'s Mot. App. 190–94; 320, 316–17). In at least one instance, in relation to the asbestos complaint, USCIS had to cease operations at the premises temporarily. (Pl.'s Mot. App. at 576, 306-12). Parties continue to dispute, to this day, whether the series of complaints filed by USCIS were reasonable and necessary or simply borne out of a sense of buyer's remorse on behalf of USCIS. (*Compare* Def.'s Mot. App. 120 ("The landlord is impossible; the flooding and need for repairs is constant. My understanding is that it has been a nightmare since it opened.") *with* Pl.'s Mot. at 44 (criticizing USCIS for conveying its complaints to GSA when Jackson had "promptly responded and addressed [those] complaints")).

[3] Unless otherwise specified, dates mentioned in this section occur in 2015.

3

new flooring, ceiling, walls, and other items that were customized for the leased space). (Def.'s Mot. App. 104–7, 122). Instead, the plan only stated that Jackson expected restoration to be complete by January 30. (Pl.'s Mot. App. 127).

GSA responded to Jackson's plan the next day, stating that it determined the plan to "be insufficient." (Def.'s Mot. App. 117). In particular, GSA noted that its plan did not "address *how* [Jackson] plan[s] to restore all tenant improvements to the As-Built conditions" at the time of the beginning of the lease. (*Id.*) (emphasis added). The following day, GSA further clarified that it was requesting that all "items such as flooring, ceiling, walls and other items that were completed as part of the initial construction," or the tenant improvements, be restored to their original condition. (Def.'s Mot. App. at 122). This letter gave Jackson less than 24 hours to submit a "revised remediation plan and schedule". (*Id.*).

On January 15, Jackson responded by submitting an updated plan that included more details on the different components of physical remediation of the space, including details on environmental testing and air-monitoring follow-up. (Def.'s Mot. App. 125–26).[4] This updated plan did not include a similar breakdown of the exact components of the work to be done to restore the spaces or explain *how* restoration was to be done. (*Id.*). Jackson's updated plan stated that all work would be completed by February 7. (Pl.'s Mot. App. 86–7). Notably, Jackson's alternate plan projected that the work would be done 8 days after the expiration of the 15-day period which the United States could exercise its termination right under the contract. (Def.'s Mot. App. 50 (Fire and Casualty Clause, ¶17)). On January 20, 12 days following the broken sprinkler head, GSA notified Jackson that it was electing to terminate the lease under the untenantability clause of the lease, because "on January 8, 2015, [the] flood at the…Premises rendered it untenantable." (Def.'s Mot. App. at 193). The notice further expressed the Government's position that the leased premises remained untenantable by the date of the letter. (*Id.*). After challenging the termination decision before the GSA's contracting officer and receiving an adverse final decision, Jackson brought this claim seeking $10,664,007.98 in damages, comprised of $8,419,016.34 in lost rents and $2,244,991.64 in remaining TI reimbursement payments. (Def.'s Mot. App. at 195–196; Pl.'s Mot. App. 7–13).

## II.   Analysis

The Court enters summary judgment in favor of a moving party when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986). A dispute over a material fact is only genuine when the evidence is such that a reasonable trier of fact could return a

---

[4] The additional detail regarding environmental testing and air-monitoring follow-up were designed to address concerns raised by GSA after Jackson's contractor had attempted to begin installing new drywall; GSA directed the contractor to refrain from that task until an industrial hygienist could certify the absence of mold. (Pl.'s Mot. App. 123,131, 594–603). GSA later directed that the testing be done by a "certified industrial hygienist," and the portions of Jackson's updated plan regarding environmental testing and air-monitoring follow-up were in response to GSA's stated concerns. (Pl.'s Mot. at 81–83; 86–88).

judgment for either party. *Id.* at 248. A material fact is one that "might affect the outcome of the suit under the governing law." *Id.*

As contract (and lease) interpretations involve matters of law, those issues are often amenable to summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002); *Cross Petro. v. United States*, 51 Fed. Cl. 549, 554 (2002). In cases involving a contract to which the United States is a party, the Court first looks at federal law to see if that would be determinative of the issue. *Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986). If federal common law is not determinative of the issue, "the best in modern decision and discussion, including the general principles of contract and landlord-tenant law, should be taken into account." *Id.*

### A.  *GSA's termination of the lease did not breach the contract.*

Both the United States and Jackson assert that they are entitled to judgment as a matter of law as to whether GSA's decision to terminate the lease breached the contract. (Def.'s Mot. at 8; Pl.'s Mot. at 24). Jackson argues that GSA breached the contract because its determination that the premises had become untenantable was "devoid of any standard [], let alone an objective standard." (Pl.'s Mot. at 17). Jackson details case law that it believes fleshes out the standard that the United States was obligated to use before terminating the lease. (*Id.* at 36–42). Jackson extrapolates that the determination of untenantability must account for multiple factors, including, the nature and severity of the damage (namely, assessing the degree of structural damage), degree of interruption caused by the damage, anticipated timeline for repairs, and cost of repair in relation to the length of the lease. (*Id.*). Jackson asserts that without articulating the basis of the untenantability determination using this standard, GSA cannot be deemed to have "determined" the premises to be untenantable, as the lease requires. (*Id.*)

The United States argues for a more straightforward approach: that the plain language of the lease gave the United States the right to determine whether the spaces were untenantable or not, using its own judgment. (Def.'s Mot. at 13). Therefore, as the United States contends, under the terms of the lease, Jackson cannot "substitute[e] its judgment" for the GSA in making the untenantability determination. (*Id.* at 9). The United States argues that adopting Jackson's position imposes a duty on the United States not captured in the lease and instead advocates for the finding that the United States' right to terminate the lease based on an untenantability determination is only subject to other terms expressly mentioned in the lease—namely written notice to the lessor within 15 calendar days of the incident. (*Id.* at 10). The significance of the exact language used in the lease agreement is better understood after reference to both the history and common practice of drafting such clauses.

It is not uncommon for leases to include an untenantability provision to expressly preserve the tenant's right to terminate the lease if the premises are rendered untenantable. 49 Am. Jur. 2d Landlord and Tenant § 229. Jackson highlights cases from other jurisdictions that address untenantability provisions. (Pl.'s Mot. at 36–42). From this survey, Jackson concludes that courts commonly assess validity of termination by independently evaluating a series of factual questions, generally including the severity of the damage, the degree of interruption caused by the damage, degree of repairs needed, and value of the lease. (*Id.*). Critically, the cases Jackson relies on involve provisions that merely clarify who should have termination right if the

5

premises are rendered untenantable. *See e.g.*, *Marcel Hair Goods Corp. v. Nat'l Savs. & Tr. Co.*, 410 A.2d 1, 2 (D.C. 1979) (interpreting "a provision of a commercial lease which permits the landlord to terminate a tenancy 'if the demised are rendered wholly untenantable by fire or other cause[]'"); *Barry v. Herring*, 138 A. 266, 267 (Md. 1927) (involving a lease provision reading "[i]f the property shall be destroyed or rendered untenantable by fire, the tenancy hereby created shall be thereby terminated …."); *Flores v. Allstate Texas Lloyd's Co.*, 229 F.Supp.2d 697, 699 (S.D. Tex. 2002) (stating that the parties agree that the policy under review "does not define untenantability."). None of these cases, however, involve analysis of a lease provision that, beyond guaranteeing termination rights, also expressly delegates to one party the right to define untenantability, as does the lease in this case. That distinction cannot be overstated. Unlike such cases, the lease in this case includes an express agreement by the parties indicating that the untenantability will be "determined by the Government." (Pl.'s Mot. App. 64 (Lease, Fire and Casualty Clause, ¶17)).

By asking the Court to apply reasoning reflected in cases that specifically pertain to lease terms devoid of such express language delegating the untenantability determination to one party, Jackson wishes away the phrase "[a]s determined by the Government." The Court, however, cannot indulge that approach because lease terms are to be interpreted like any other contract terms. *WDC W. Carthage Assocs. v. United States*, 324 F.3d 1359, 1363 (Fed. Cir. 2003). This means that the Court will read the lease to give "meaning to all its parts and avoids conflict or surplusage of its provisions." *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983) ("[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.").

Importantly, although lease provisions that expressly delegate the power to determine untenantability to one party are rare, they are not entirely alien to this Court. On at least one occasion, this Court's predecessor interpreted a lease provision that included an identical clause. *See Brown v. United States*, Case No. 13-79, 1981 U.S. Ct. Cl. LEXIS 1480, at *13–14 (Sept. 3, 1981) (interpreting a lease provision reading: "In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease . . .").[5] In *Brown*, the Court reasoned that such express agreements meant that the Government's determination of untenantability precluded plaintiffs from challenging that determination. *Brown*, at *7 n.3 (finding that plaintiff could not challenge the Government's determination of untenantability, because "paragraph 3 of the lease specifically provided for the government to make that determination.").

Similarly, in *North Star Alaska Hous. Corp. v. United States*, the Court once again emphasized the significance of the clause "as determined by the Government," in commercial

---

[5] While decisions of state courts and Federal Courts of Appeals (other than the Court of Appeals for the Federal Circuit) only serve as persuasive authority for this Court, decisions by this Court's predecessor constitute binding authority. *S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) ("We hold that the holdings of our predecessor court[], the United States Court of Claims[,] . . . shall be binding as precedent in this court.").

leases. 30 Fed. Cl. 259 (1993). In that case, the United States leased land to an Alaskan Corporation charged with constructing and operating housing facilities. *Id*. at 269–70. After vandalism at the property, the Court reviewed the lease to determine which party was responsible for the cost of repairs caused by malicious damage to the property. *Id*. The Court began its analysis by reviewing the plain language of the lease and emphasized that an earlier draft of the lease provided that "[r]epair of damages which occur to the units or other improvements that cannot be attributed to the government, his agents, officers, occupants, their dependents, or invited guests, *as determined by the government*, shall be accomplished by the developer at no cost to the government." *Id*. (emphasis added). The Court followed up by noting that the final draft of the lease "contained the same clause, but it did not include the line 'as determined by the Government.'" *Id*. "The difference between the two clauses," the Court stressed, "indicates that the change of wording may have been bargained for by plaintiff," and as much this change must be viewed as "crucial to the final determination of this issue." *Id*. Similar to *Brown*, the Court in *North Star*, also found that when the express language of the lease assigned determination of a certain condition to one party, the other party, by signing the agreement, accedes to the other party's future determination. *Id.* at 260–70 ("If responsibility for repair is 'determined by the Government,' then the court has nothing to decide. The Government has already determined that it was not responsible for the damage and plaintiff would have to bear the costs of repair.").

Neither is the Court of Claims the only court to adopt this approach to interpreting "as determined by" clauses. *See e.g*., *Kihlberg v. United States*, 97 U.S. 398, 402 (1878) (finding that where, in a contract for the transportation of Government stores, it was agreed that distances should be "ascertained and fixed by the chief quartermaster," the chief quartermaster's determination "was conclusive upon the parties" and not subject to review.); *W. R. Lathom Tool & Machine Co. v. Mutual Leasing*, 105 Ill.App.3d 1043, 1046 (Ill. App. Ct. 1982) (finding that when the lease gave the lessee the power to purchase the leased equipment at "fair market value as determined by [the lessee]," the lessee's determination, even if subjective, "must be accepted by the lessor."). The plain language of the lease, therefore, precludes Jackson from substituting its own judgment for that of the GSA in determining untenantability.

To acknowledge that the express terms of the lease leave the untenantability determination to the discretion of the GSA is not to say that the United States' determination is unbounded; that determination, like the exercise of any other contract right that is left to one party's discretion, must be made in good faith. *See e.g.*, *Kurkijan v. Sec'y of the Army*, 2021 U.S. App. LEXIS 23782, at *13–14 (Fed. Cir. Aug. 11, 2021) (finding that the Government's decision to not exercise a contract must be done in good faith even though the contract's language "places no restriction on the government's discretion option[.]").[6] Rather, it is to say that the United States' determination is conclusive as to those disagreements between the parties that amount to mere honest differences of judgment. This encompasses Jackson's disagreements with GSA's assessments in this case, such as whether the damage could have been remedied through "ordinary repairs," whether there was an unreasonable interruption to the tenant's business operations, or whether the cost of repairs should be viewed as relatively low in comparison to the

---

[6] As Federal Circuit Rule 32.1 states, the Court only considers nonprecedential or unpublished dispositions by the Federal Circuit to the extent that they may provide "guidance or persuasive reasoning." *See also* Kandel v. United States, 160 Fed. Cl. 255, 257 (2022).

7

total value of the lease, or whether the damage to the premises can be characterized as severe or not. (Pl.'s Mot. at 36–42). Jackson's argument that the United States cannot rely on its "subjective belief" to assess its factors, or that its reasoned inquiry should be subject to independent court evaluation contravenes the plain terms of the parties' agreement. *See Reservation Ranch v. United States*, 39 Fed. Cl. 696, 714–15 (1997) (finding that "when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract," the Court reviews that decision "narrowly[.]").

Jackson also asks the Court to find that GSA never, as a matter of law, actually "determined," the premises to be untenantable. (Pl.'s Mot. at 31, 35 (arguing that the Government's decision does not communicate any "objective standard," or explain the factors it relied on)). Jackson views the clause "as determined by the Government," to not only impose on the United States the duty to rely on an entirely pre-imposed standard—a position that the Court rejects—but the requirement to memorialize, document, and explain this standard and analysis at the time it notified Jackson. (*Id*.). But Jackson does not point to any controlling or persuasive authority that imposes such an obligation.

To support the argument that GSA is obligated to "proffer [] direct evidence to support its assertions that it had determined the space" to be untenantable, Jackson attempts to analogize to *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 766 (Fed. Cir. 1987). But that case did not involve the issue of untenantability determination, let alone involve a lease provision that specifically delegated determination power to the United States. Instead, in *Lisbon*, the Court reviewed a termination notice issued by the United States under a default termination clause that openly stated that such determination will be subject to independent review. *Id*. (interpreting a default clause that read: "If, after notice of termination of the Contractor's right to proceed under the provisions of this clause, *it is determined for any reason* that the Contractor was not in default under the provisions of this clause," the termination may be converted to a termination for convenience) (emphasis added).

In fact, in the only directly controlling case in which the Court reviewed a GSA termination decision pursuant to an identically phrased clause, the Court held that nothing more than a written notice notifying the lessor of the determination to terminate the lease was necessary. In *Brown*, as discussed above, the Court determined that the United States' notice of termination communicated through a letter to the lessor sufficed as an exercise of the United States' right under the lease when it was clear that (1) the untenantability determination had been made by a government official possessing authority to make that decision, (2) the official had consulted with those who had personally visited the site and the damage, and (3) the official had considered the repair and remediation plan. *Brown*, at *7; *see also Richardson v. United States*, 17 Cl. Ct. 355, 356–58 (1989) (upholding termination in which contracting officer sent a letter to lessor explaining reasons for termination, though the court did not know exactly when Government determined untenantability).

GSA's uncontroverted conduct in this case followed the same pattern: the contracting officer at GSA made the untenantability determination; that officer was briefed by both GSA officers and USCIS officers who had personally observed the damage and conveyed their assessments; and before exercising the right to terminate the lease, the officer had the chance to consider the adequacy of a remediation and restoration plan. (Def.'s Mot. App. 502, 506; Pl.'s

Mot. at 69). Jackson has not established that this conduct fell below the required legal standard. Likewise, Jackson has also not established that the United States owed a duty not otherwise captured explicitly in the terms of the contract to justify and communicate the details of its untenantability determination to Jackson in the standard that Jackson deems objective or that the contracting officer was under the duty to personally visit the premises. (Pl.'s Mot. at 31); *see Holt v. United States*, Case No. 391-76, 1980 U.S. Ct. Cl. LEXIS 1151, at *25 (Aug. 20, 1980) (finding that the contracting officer did not act in bad faith when he issued termination notice without personally inspecting the premises because this "Court has on several occasions concluded that supervisors can reasonably rely on the information supplied by subordinates"). Imposing such requirements on GSA now would be tantamount to rewriting already agreed-upon contract terms; by adopting Jackson's logic, the Court meanders outside of the four corners of the contract and through the looking glass,[7] interpreting instead a provision that might as well read untenantability "as determined by Jackson." *American Cap. Corp. v. F.D.I.C.*, 472 F.3d 859, 865 (Fed. Cir. 2006) ("We cannot rewrite a contract or insert words to which a party has never agreed.").

Jackson nevertheless rings the alarm, urging that the United States' reading of the lease leaves the door open to the tenant to "easily cancel the entire lease," even when "a transient condition damaged the aesthetic finishing to a small portion of the space." (Pl.'s Reply at 10, ECF No. 96). Although the clear terms of the contract can narrow the focus of the Court's review by delegating certain determinations to one party, such agreements do not completely foreclose judicial review. Rather, the longstanding approach has been that even exercises of contractual sole discretion always remain subject to the duties implied in every contract, such as the duty of good faith and fair dealing. *Goltra v. Weeks*, 271 U.S. 536, 547 (1926) (holding that "a contract permitting a lessor of personal property to terminate the lease upon noncompliance, *in his judgment*, with any of its terms and conditions, is valid unless there is an absence of good faith in the exercise of the judgment) (emphasis added); *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 291 (2007) ("An implied term of every contract, including government contracts, is that each party will act in good faith toward the other, and that a party may be found to have breached the contract by acting in bad faith.").

Therefore, even though the Court cannot independently scrutinize the adequacy of the metrics used by GSA to arrive at the untenantability determination, it can inquire into whether the United States carried out its duty to determine untenantability under the contract in good faith. *See e.g.*, *Brown*, at *7 (holding that the Government cannot be held liable for exercising the right to determine untenantability when the decision was made "in good faith"); *Orange Cove Irrigation Dist. v. United States*, 28 Fed. Cl. 790, 800 (1993) ("When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable."). Finding that the United States had the right to independently determine untenantability, the Court proceeds to analyze whether the United States violated the duty of good faith and fair dealing in exercising that right.

---

[7] L. Carroll, Alice in Wonderland and Through the Looking Glass 227 (J. Messner ed. 1982).

> B. *GSA's decision to terminate the lease did not violate the duty of good faith and fair dealing.*

There are certain requirements that are implicitly imposed in every contract, such as the covenant of good faith and fair dealing. *Lakeshore Eng'g Servs. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014). The covenant of good faith and fair dealing is breached when there has been "sharp dealing," such that it denies the other party rights granted under the contract. *Dobyns v. United States*, 91 Fed. Cl. 412, 421 (2010) (citing *Market St. Assocs. L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (Posner, J.)). The Federal Circuit has stated that a party must establish a breach of this covenant by clear and convincing evidence. *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368–69 (Fed. Cir. 2012); *Long Lane Ltd. P'ship v. Bibb*, 159 Fed. Appx. 189, 192 (Fed. Cir. 2005) (finding that uncorroborated affidavits and interrogatory responses cannot be used to meet the "clear and convincing" standard that is required to prove GSA's alleged bad faith). The implied duty of good faith and fair dealing cannot expand a party's duties beyond those in the express contract, and neither can the exercise of a legitimate contractual right constitute a breach of that duty. *Scott Timber Co. v. United States*, 692 F.3d 1365, 1375 (Fed. Cir. 2012) (citing *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981) and *Precision Pine & Timber v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010)).

The evidence offered by Jackson, even when viewed in the light most favorable to Jackson, does not support the conclusion that GSA exercised the discretion to determine untenantability in bad faith, much less rise to a level approaching the clear and convincing standard. *Rd. & Highway Builders*, 702 F.3d at 1369. Although not universally adopted by all jurisdictions, it is not uncommon for courts to define untenantability in commercial leases so to refer to conditions that make the premises "unfit for the purpose for which they were leased," without any reference to the sufficiency of a landlord's plan to remediate the space. 61 A.L.R.2d 1445 § 5 (compiling cases). Jackson disputes that the United States could have determined the premises to be untenantable without first analyzing Jackson's plan to repair using the methodology Jackson proposes—an interpretation that the Court has found to contravene the plain terms of the lease. However, even though that approach leads Jackson to dispute the method United States used to determine untenantability, Jackson does not dispute that in the immediate aftermath of the flooding the United States could no longer realistically use the damaged portions of the premises for the purposes for which they were leased.[8] In other words, at least some portions were "unfit for the purpose for which they were leased." 61 A.L.R.2d 1445 § 5.

---

[8] Although Jackson continues to boldly insist that USCIS should have continued operations because "no municipal or similar authority [had] directed the Government," or to assert that the spaces could have somehow been used, solely because "all the utilities were restored on the same day…", (Pl.'s Reply at 8), it has not provided any evidence from the record indicating that it ever communicated such assertions to the Government or ever raised doubts about the fact that the premises needed to be temporarily evacuated. *See TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (finding that "general assertions of facts, general denials, and conclusory statements," are insufficient to overcome summary judgment).

In this case, USCIS used the premises, among other purposes, to interview hundreds of visa applicants and other visitors every week. (Def.'s Mot. App. 211, 340–448). The office included spaces for public presentations, a ceremony room, and a waiting room to accommodate visitors. (Pl.'s Mot. App. 357). Given the nature of the work performed, the premises housed boxes of confidential documents. (Pl.'s Mot. App. at 137–192, 430, 356, 404). The record indicates that the water leak caused the spaces to flood with approximately "1 inch of water," and that water damaged equipment such as the video projector in the ceremony room and boxes containing files. (Def.'s Mot. App. 97, 124 (MM Environmental Survey); Pl.'s Mot. App. 338 (Jan. 8 Incident Report)). It is also undisputed that flooding damaged portions of the drywall, ceiling tiles, and carpets, thereby necessitating replacement. (Pl.'s Mot. App. 337–38, 401–404).

GSA's decision to find the premises untenantable when USCIS had to cease daily operations because of water damage is not so unreasonable as to be contrary to common expectations of the parties or inconsistent with contractual purposes; therefore, it does not constitute a violation of the duty of good faith and fair dealing. *Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1, 7 (2015) (finding that the implied duty of good faith and fair dealing protects the parties' "reasonable" expectations that may not have been embodied in the contract's language) (quoting *Restatement (Second) of Contracts* § 205 cmt. a.). Accordingly, Jackson has failed to provide sufficient evidence that GSA's determination that the premises had become untenantable in the immediate aftermath of the leak was made in bad faith.

Jackson also claims the duty of good faith and fair dealing was violated because of GSA's motives behind that determination, claiming that the decision was pretextual. (Pl.'s Mot. 28). To support this claim, Jackson marshals some evidence gathered from USCIS internal communications, (Pl.'s Mot. at 41–49), arguing that emails in which USCIS officials speak of the relationship with Jackson negatively, establish that the United States desired to terminate the lease notwithstanding the adequacy of Jackson's plan to remediate and restore the space. (*Id.*). In these emails, USCIS employees express their dissatisfaction with how Jackson has responded to earlier complaints about the building condition; in other emails, USCIS employees expressed their willingness to terminate the lease. (*See e.g.*, Def.'s Mot. App. 108, email from USCIS supervisory lease admin Specialist (stating that ending the lease "would save us years of headaches."), 120, email from USCIS New York District Director (stating that "[o]ur goal should really be to get out of that entire building forever.")). Jackson's second charge of bad faith is based on internal government emails indicating that GSA made the official decision to terminate the lease before Jackson's deadline for submitting its updated plan for remediation and restoration. (Pl.'s Mot. at 45).

First, and critically, as the United States correctly argues, the communications relied upon by Jackson in which employees advocate for terminating the lease because of Jackson's past performance on the contract invariably involve USCIS officials, not GSA officials—the only ones with the actual authority to terminate the lease. (Def.'s Mot. at 24). As the Court has previously found, statements from employees at the client-agency expressing dissatisfaction about the quality of contractor's performance do not establish bad faith on behalf of the contracting officer. *Custom Printing Co. v. United States*, 51 Fed. Cl. 729, 736 (2002) (finding that employees' statements reflecting "that the agency did not wish to renew" a contract could not establish bad faith because they "were made by an official at [the client agency], not the

11

contracting officer."). Jackson has not provided any direct evidence that the contracting officer expressed ill will or prejudice towards Jackson. Instead, Jackson argues that despite USCIS officers' lack of authority to make decisions about the lease, they exerted inordinate influence over GSA. (Pl.'s Mot. at 43). Jackson points to emails from USCIS officials in which they stated that they had "reiterated" their desire to GSA to terminate the lease and other emails that indicate various USCIS officials reaching out to GSA to express their desire to terminate the lease, chronicling past issues with Jackson, or in sum "do[ing] whatever [they could] to help with the termination process." (Pl.'s Mot. at 43–44; Pl.'s Mot. App at 407–08, 429). To attribute these actions to GSA officials, the actual party to the lease, it is not enough to show that the USCIS officers' dissatisfaction with Jackson and their desire to terminate the lease was conveyed to the GSA; the Court has consistently held that nothing prevents the contracting officer from seeking counsel from other government officials to inform the contract decision. *North Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 209 (2007) ("Maintaining impartiality, of course, does not prevent a contracting officer from consulting with other government officials."); *Pacific Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974) ("there is no implied prohibition against [the contracting officer] first obtaining or even agreeing with the views of others.").

Rather, Jackson must show that the contracting officer "gave in to pressure from other Government officials to abdicate his responsibility to be impartial and agreed to support contract interpretations made by officials, who were openly contemptuous of the contractor." *See RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 789 (2017). This standard requires proof that the contracting officer "released authority" to others to such a degree that the final decision can no longer be described as reflecting the contracting officer's "personal and independent judgment." *CEMS, Inc. v. United States*, 65 Fed. Cl. 473, 479–80 (2005). Evidence of a connection between USCIS employees' conduct and GSA cannot be simply implied from GSA's ultimate decision to terminate the lease, as Jackson attempts to do, especially when the Court has held that GSA rightfully exercised that power under the contract. *See Lake Charles XXV, LLC v. United States*, 118 Fed. Cl. 717, 727 (2014) ("GSA's actions in administering the contract were consistent with the contract's requirements, which cannot be evidence of bad faith.").

Even accepting the facts as Jackson presents, it is clear that GSA and the contracting officer exercised independent judgment in terminating the lease, despite receiving consultation from USCIS. When USCIS's requests to break the lease were communicated to GSA, GSA responded it was going to "investigat[e] what the options are," and if "there is a chance that GSA can break the lease." (Pl.'s Mot. App. 361). Similarly, when USCIS's desire to terminate the lease was "reiterated" to GSA, what USCIS heard back was that GSA "has to follow [the] process" that GSA normally follows to protect against any "future claims." (Pl.'s Mot. App. at 341). When Jackson submitted its remediation and restoration plans, USCIS internal emails clearly indicated that although GSA was "pursuing termination," they may only do so "if the lessor's mitigation plan and effort do not meet *GSA standards*." (Pl.'s Mot. App. at 416 (emphasis added)). Emails also indicate that Jackson's updated plan was independently reviewed by GSA before being forwarded to USCIS. (Pl.'s Mot. App. at 175 ("[t]he Lessor's revised remediation plan is being reviewed by our IH and then will be forward[ed] to DHS USCIS.")). The evidence offered by Jackson fails to establish a genuine issue of material fact as to whether GSA acted in bad faith because that evidence still indicates that the contracting officer retained "independent judgment" despite insistence from USCIS. *See Holt*, 1980 U.S. Ct. Cl. LEXIS

12

1151, at *26 ("Plaintiff's attempt to prove bad faith is also weakened by the fact that the contracting officer did not immediately terminate the contract as urged by [client agency's employees]."); *Anderson*, 477 U.S. at 250 (finding that a fact is only "material" when it impacts the determination of the case taking into account "the governing law").

Second, any communications between USCIS and GSA that occurred after GSA already determined that the premises were untenantable is not material to the Government's duties under the contract. Arguably, those later communications may have influenced the assessment of Jackson's remediation plans, but not the initial untenability determination. That decision was made in the immediate aftermath of the leak and prior to many instances of communications between USCIS and GSA that Jackson relies on. (*See* Pl.'s Mot. at 42 (arguing that the Government violated the duty of good faith and fair dealing by not seriously considering Jackson's restoration plan because of USCIS's pressure to terminate the lease)). While many commercial leases include untenantability provisions that only allow the tenant to terminate the lease after it is determined that the premises cannot be repaired by the landlord, this lease contained no such language. *See e.g., Shaukat v. Wilcox*, 61 N.Y.S.3d 193 ("Paragraph 13 of the lease provides that either party may terminate the lease in the event of the partial destruction of the premises *and the lessor's inability to repair the damage within 60 days*.") (emphasis added). Once the untenantability determination was made, GSA's right to terminate the contract under the lease triggered; all that was left, so long as the premises remained untenantable, was the Government's discretionary decision to either exercise or refrain from exercising that right. (*See* Pl.'s Mot. App. 69, Letter from the GSA (stating that the Government "may elect" to terminate the lease if the remediation and restoration plan is insufficient)). As such, that influence, even if it existed, did not "reappropriate" any benefit that Jackson was guaranteed to under the lease. *Precision Pine*, 596 F.3d at 829. For the same reason, Jackson's allegations that GSA was proceeding with termination of the contract prior to receiving Jackson's final updated plan (even if credited) do not constitute evidence of bad faith.

As the Court has previously held, once the contracting officer rightfully determines that termination may be proper, "routine contract administration concerns" that are often left to the discretion of the agencies, such as timing and manner of proceeding with the final decision, do not constate bad faith. *See e.g.*, *Lake Charles*, 118 Fed. Cl. at 728 (finding that the contracting officer "was acting in its legitimate interest in pressuring [the contractor] to perform" and to discuss termination internally once "it became apparent that [contractor] would not meet the delivery date."); *Armour of Am. v. United States*, 96 Fed. Cl. 726, 750 (2010) (finding that even though the Army's decision to "backdate" its termination letter with supporting documents did not "demonstrate[] best practices," it was not sufficient to establish bad faith).

Finally, the high burden for showing that government officials acted in bad faith requires Jackson to show "specific intent to injure." *Rd. & Highway Builders*, 702 F.3d at 1370. In applying this standard, the Court has held that mere evidence of "a poisoned working relationship," between the agency and the contractor or evidence of "the agency's sometimes passive-aggressive management style," does not rise to the level of specific intent to injure. *Liquidating Tr. Ester Duval of Kl Liqudation*, 116 Fed. Cl. 338, 384 (2014); neither do mere instances of "inappropriate and unprofessional" conduct due to friction between the agency and the contractor. *Neal & Co. v. United States*, 36 Fed. Cl. 600, 631 (1996) (finding that the agency employee's inflexible approach to the contract which lead to "delay[s] and [] cost increases," did

13

not rise to the level of bad faith). The Court's approach accounts for the potential for tension between a contractor and the client-agency but is in line with the long-recognized principle that the United States should not be denied its rights under the contract just because it cannot "secure perfect performance from its hundreds of thousands of employees scattered throughout the continent." *Office of Pers. Management v. Richmond*, 496 U.S. 414, 434 (1990) (citing *Hansen v. Harris*, 619 F.2d 942, 954 (2nd Cir. 1980) (Friendly, J., dissenting)). Despite the unquestionably tumultuous relationship between Jackson and USCIS, the evidence provided by Jackson does not create a genuine issue of material fact as to whether United States acted in bad faith in terminating the lease.

### C. Equitable estoppel does not bar the United States.

The traditional elements of equitable estoppel are: (1) misleading conduct, including not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted. *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (citation omitted). Even though the Supreme Court has not adopted a per se rule prohibiting the application of equitable estoppel against the United States in all circumstances, it has found that "the government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs.*, 467 U.S. 51, 60 (1984). The Supreme Court has noted that this heightened standard means that to prevail against the government on an equitable estoppel claim, the moving party must, in addition to the traditional elements, show "some form of affirmative misconduct." *Id.* at 67. The Federal Circuit has adopted this standard. *Zacharin v. United States*, 213 F.3d 1366 (Fed. Cir. 2000). Mere negligence is insufficient. *See Melrose Assocs., L.P. v. United States*, 45 Fed. Cl. 56, 60 (1999) (finding that no bad faith exited when the government employee lacked "intent to injure the plaintiff, or [acted] with knowledge of true facts."); *see also Perez-Mejia v. Holder*, 641 F.3d 1143 (9th Cir. 2011) (stating that most Circuits have adopted the affirmative misconduct standard and view it as requiring something "beyond mere negligence" from government agents); 33 Fed. Prac. & Proc. Judicial Review § 8354. Accordingly, the party that invokes the doctrine of equitable estoppel against the government "bears a heavy burden." *Kaeper Mach., Inc. v. United States*, 74 Fed. Cl. 1, 8 (2006); *see also Estate of Akin v. United States*, 31 Fed. Cl. 89, 96 (1994) (noting that courts rarely apply equitable estoppel against the United States government). Jackson fails to meet this standard.

Jackson highlights four instances of government conduct that form its equitable estoppel claim. (Pl.'s Mot. at 49–53). First, Jackson argues that the United States' agents should have entered the building in response to an internal security alarm that was triggered on the premises on the night of January 8, with the theory that this alarm could have been related to the water leak that occurred hours later in the morning of January 9. (*Id.*) Second, Jackson claims that the FDNY's access to the building was delayed by an hour, attributing this delay to government officials in charge of granting FDNY access to the building. (*Id.*) Third, Jackson argues that the Government's requirement that Jackson's contractors be accompanied by security guards when they were remediating portions of the space delayed the contractor's work. (*Id.*) Fourth and finally, Jackson claims that the United States intentionally delayed the repairs through its unwarranted demands to Jackson to restore the space to the same condition it was at the beginning of the lease. (*Id.*).

14

Regarding the United States' conduct on the night of the first incident, even construing the facts in a light most favorable to Jackson, Jackson has not established that any of the officers in charge of responding to the alarm or coordinating with the fire department engaged in "affirmative misconduct," with the intention of robbing Jackson of the benefits it was entitled to under the contract. This alleged conduct amounts to mere negligence that is insufficient to maintain Jackson's claims. *See e.g.*, *Demarco Durzo Dev. Co. v. United States*, 60 Fed. Cl. 632, 638 (noting that the contracting officer must have acted "intentionally" and "deliberately" to establish an equitable estoppel claim). Moreover, the relationship between the internal security alarm and the broken sprinkler head hours later is, at best, based on uninformed speculation. (*See* Pl.'s Mot. App. 218–19 (statement from USCIS officer noting that some USCIS officers "*wonder[ed]* if the [first] alarm was actually triggered by the faulty sprinkler"), 592–93 (Weishaar Dep. at 168:12-169:3) (stating that "*theoretically* water can short out a sensor.")); *see also* RCFC 56 (requiring existence of genuine issue of material fact to preclude summary judgement and that generally, alleged facts be admissible as evidence); FRE 602 (a witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); FRE 701 (general prohibition against opinion testimony by lay witness).

Neither can the United States be equitably estopped because of the delay Jackson's contractors faced in their remediation efforts. In addition to the absence of any evidence indicating that this constituted "affirmative misconduct," Jackson's claim fails the legal standard for showing material prejudice. *Mabus*, at 1359. Jackson specifically argues that on January 12, when its contractor planned to remediate the space on the second floor, it was delayed entry because USCIS insisted that guards must be present for that work. (Pl.'s Mot. at 20; *see also* Pl.'s Mot. App. 412–14). The only evidence relied upon by either party from the record about the availability of guards on January 12, indicates at most a two-hour delay before Jackson's contractor could gain access. (Def.'s Resp. at 23, ECF No. 93–3). In addition to failing to establish that USCIS and GSA's failure to have the guards available earlier that day amounts to affirmative misconduct, Jackson has not shown that it was materially prejudiced by this delay. The United States has persistently, and persuasively, advocated that GSA's ultimate termination decision (as reflected in the record) was informed by the insufficiency of detail provided by Jackson about its *restoration* efforts—not the pace of Jackson's remediation efforts. Therefore, because the GSA has never claimed that the termination decision was in any way informed by the pace of ongoing remediations, Jackson cannot establish material prejudice as a result of any delay in its remediation efforts caused by the Government that day.

Finally, Jackson argues that the "unwarranted" standard set by GSA (that Jackson should restore the leased spaces to "As built" conditions) was designed "intentionally" to delay the repairs. (Pl.'s Mot. at 53). But Jackson does not point to any evidence in the record that would suggest that it relied on that standard to its detriment; in fact, the lack of details about Jackson's exact approach to restoring the premises is the precise reason provided by GSA as the reason for exercising the termination right. (Def.'s Mot. App. 117, 193 (GSA letters notifying Jackson that its restoration plans lacked sufficient detail)). Even if either the delay of the arrival of security guards or the GSA's stated standard for restoration had the impact that Jackson alleges they had, as with the first two instances of Government conduct, Jackson has not established that these actions meet the standard of affirmative misconduct. Neither of the allegations raised by Jackson meet the necessary legal standard to establish equitable estoppel.

### III.     Conclusion

It is not uncommon for government contracts to involve quite complicated and intricate transactions, but the complex scenery cannot distract the Court from the fundamentals of contract law that apply to private parties and federal agencies equally: one of which is that the United States, just like private parties, is entitled to the benefit of its bargain. *Lynch v. United States*, 292 U.S. 571, 579 (1934). Here, Jackson agreed to let the government determine when the conditions of the premises were to be deemed untenantable as a result of partial damage; having done so, it cannot now rewrite the parties' agreement to include expectations that the parties decided to leave unexpressed. As the Supreme Court noted in *Goltra*, a contract "stipulation may be a harsh one or an unwise one," as is "often [] in government contracts in which the determination of a vital issue under the contract is left to the decision of a government officer," yet those provisions are still "valid and binding if entered into." 271 U.S. at 548. The Court also finds that the factual disputes, even when viewed in the light most favorable to Jackson, fail to establish that the United States acted in bad faith or engaged in affirmative misconduct in exercising its right under the plain language of the lease.

For the foregoing reasons, the United States' motion for summary judgment, (ECF No. 82), is **GRANTED** and Jackson's cross-motion for summary judgment, (ECF No. 88), is **DENIED**. The Clerk is **DIRECTED** to enter judgment in favor of the United States.

**IT IS SO ORDERED.**

s/     David A. Tapp
DAVID A. TAPP, Judge